UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-v.-

CRAIG L. BERKMAN,

Defendant.

13 Cr. 477 (SAS)

## GOVERNMENT'S SENTENCING MEMORANDUM

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

John J. O'Donnell
Matthew L. Schwartz
Assistant United States Attorneys
    *Of Counsel*

# TABLE OF CONTENTS

Page

FACTUAL BACKGROUND ..................................................................................................1

    A.  The Charges .............................................................................................................1

    B.  The Offense Conduct ..............................................................................................2

        1.  The Fraudulent Offerings .............................................................................2

        2.  The Misappropriation of Investor Funds......................................................4

        3.  Fraud In The Bankruptcy Court ...................................................................5

    C.  Berkman's Guilty Plea ............................................................................................6

DISCUSSION ......................................................................................................................7

    A.  Applicable Law ........................................................................................................7

    B.  Analysis ...................................................................................................................8

        1.  Application of the Sentencing Guidelines....................................................9

        2.  An Analysis of the Section 3553(a) Factors Militates Forcefully In Favor of a Guidelines Sentence ..................................................................................10

            (a)  A Guidelines Sentence Is Appropriate in Light of the Nature and Circumstances of Berkman's Conduct, and Is Necessary to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment ..............................................................10

            (b)  A Guidelines Sentence Is Necessary to Afford Adequate Deterrence.....13

            (c)  A Guidelines Sentence Is Necessary to Avoid Unwarranted Sentence Disparities ..........................................................................................15

        3.  The Individual History and Characteristics of the Defendant Do Not Counsel Against a Guidelines Sentence...............................................................18

    C.  The Defendant's Restitution and Forfeiture Obligations ......................................20

        1.  Restitution ...................................................................................................20

        2.  Forfeiture....................................................................................................22

CONCLUSION ..................................................................................................................22

# TABLE OF AUTHORITIES

Page

**Cases**

*Berkman* v. *SEC*, Case No. 12-MC-66-T-17-TGW (M.D. Fla. 2012)....................................18

*Gall* v. *United States*, 128 S. Ct. 586 (2007) ........................................................7, 8

*In re Craig L. Berkman*, No. 09 bk 05169 CED (Bank. M.D. Fla.) ......................................7

*In re Synectic Asset Management*, No. 09 bk 05172 CED (Bank. M.D. Fla.)........................7

*Rita* v. *United States*, 127 S. Ct. 2456 (2007)..........................................................7

*United States* v. *Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) ..............................16, 17

*United States* v. *Agate*, 613 F. Supp. 2d 315 (E.D.N.Y. 2009)..............................21

*United States* v. *Booker*, 543 U.S. 220 (2005)............................................................7

*United States* v. *Carboni*, 204 F.3d 39 (2d Cir. 2000)..........................................21

*United States* v. *Coriaty*, 300 F.3d 244 (2d Cir. 2002)............................................20

*United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005)............................................7

*United States* v. *Donaghy*, 570 F. Supp. 2d 411 (E.D.N.Y. 2008) ........................21

*United States* v. *Fogel*, 494 Supp. 2d 136 (D. Conn. 2007) ....................................21

*United States* v. *Frias*, 521 F.3d 229 (2d Cir. 2008) ............................................15

*United States* v. *Germosen*, 139 F.3d 120 (2d Cir. 1998)......................................21

*United States* v. *Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012) ..............................16, 17

*United States* v. *Martin*, 455 F.3d 1227 (11th Cir. 2006)......................................13, 14

*United States* v. *Mueffelman*, 470 F.3d 33 (1st Cir. 2006) ....................................14

*United States* v. *Regensberg*, 635 F. Supp. 2d 306 (S.D.N.Y. 2009) ....................12, 19

*United States* v. *Rubenstein*, 403 F.3d 93 (2d Cir. 2005) ......................................7

*United States* v. *Silkowski*, 32 F.3d 682 (2d Cir. 1994)........................................20

*United States* v. *Uddin*, 551 F.3d 176 (2d Cir. 2009) ...........................................................21

**Statutes and Rules**

15 U.S.C.§ 78 .................................................................................................2

17 C.F.R.§ 240.10b-5 .....................................................................................2

18 U.S.C.§ 1343 ..............................................................................................2

18 U.S.C.§ 3553 ......................................................................................*passim*

18 U.S.C.§ 3663 ...........................................................................................20

18 U.S.C.§ 3664 ......................................................................................20, 21

U.S.S.G. § 2B1.1 .....................................................................................*passim*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        -v.-<br><br>CRAIG L. BERKMAN,<br><br>        Defendant. | 13 Cr. 477 (SAS) |

## GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum in connection with the December 16, 2013 sentencing of defendant Craig L. Berkman (the "defendant" or "Berkman") and in response to the defendant's December 5, 2013 Sentencing Letter ("Def. Ltr."). As set forth herein, a sentence within the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") range of 97 to 121 months' imprisonment, as set forth in the Presentence Investigation Report ("PSR"), is reasonable and appropriate given the nature and seriousness of the offense. Furthermore, as discussed below, a sentence within the Guidelines range is sufficient, but not greater than necessary, to serve all of the legitimate purposes of sentencing.

## FACTUAL BACKGROUND

**A.     The Charges**

The defendant was arrested in the Middle District of Florida on March 19, 2013, pursuant to an arrest warrant issued in connection with a criminal complaint filed in this District on March 15, 2013. (PSR ¶ 29).[1] Subsequently, on June 25, 2013, Berkman waived indictment and pleaded guilty to a criminal information (the "Information"), that charged him with (1) securities

---

[1]     Paragraph 29 of the PSR states that the defendant was arrested on March 15, 2012, which is incorrect. The defendant was arrested in 2013.

fraud, in violation of Title 15, United States Code, Sections 78j(b) & 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5 (Count One); and (20 wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2 (Count Two).  (PSR ¶¶ 2-5).

## B.    The Offense Conduct

At various times relevant to the Information, Berkman controlled a series of limited liability companies ("LLCs"), including Face-Off Acquisitions, LLC ("Face-Off Acquisitions"), Assensus Capital LLC ("Assensus"), and several LLCs with variations of the words "Ventures Trust" in their names ("Ventures LLCs").  (Information, ¶ 1; PSR ¶¶ 9-11).

From in or about October 2010 through in or about March 2013, Berkman fraudulently raised at least $13.2 million from approximately 120 investors by selling membership interests in these LLCs.  (Information, ¶ 2).  Berkman misrepresented to investors that the LLCs either owned or would acquire pre-initial public offering ("pre-IPO") shares in various private technology companies.  (*Id.*).  In addition, contrary to his representations concerning the use of investor funds, Berkman misappropriated for his own use and benefit millions of dollars in investor funds.  (Information, ¶ 2; PSR ¶ 27).

### 1.   The Fraudulent Offerings

Berkman's scheme involved material misrepresentations to investors in connection with offerings in the various LLCs, including the Ventures LLCs, Face-Off Acquisitions, and Assensus Capital.  (Information, ¶ 3; PSR ¶¶ 12-26).  First, Berkman told investors in various Ventures LLCs that their funds would be used to acquire highly coveted, pre-IPO shares of Facebook, Inc. ("Facebook"), LinkedIn, Inc. ("LinkedIn"), Groupon, Inc. ("Groupon"), and Zynga Inc. ("Zynga").  (Information, ¶ 3).  These representations were false and misleading

2

because, as Berkman well knew, none of the Ventures LLCs owned pre-IPO LinkedIn, Groupon or Zynga shares, and one of the Ventures LLCs owned far fewer Facebook shares than Berkman represented.  (Information, ¶ 3; *see generally* PSR ¶¶ 12-19 (details concerning the Ventures Trust II/Facebook scheme)).[2]  And, contrary to his representations to investors about acquiring further pre-IPO shares in these companies, Berkman misappropriated most of the investor funds for his own use and benefit.  (Information, ¶ 3; PSR ¶ 27).

Second, in another offering fraud, Berkman told investors in Face-Off Acquisitions that their money would be used either to purchase pre-IPO shares of Facebook or to acquire a company that held pre-IPO Facebook shares.  (Information, ¶ 4; PSR ¶¶ 20-26).  These representations were false.  Rather than acquiring such pre-IPO shares, Berkman misappropriated the investors' funds for his own use and benefit.  (Information, ¶ 4; PSR ¶ 27).

In a third offering fraud, Berkman told investors in Assensus Capital that he would use their money to fund various ventures, including technology, medical device, and energy companies.  (Information, ¶ 5).  Contrary to these representations, Berkman misappropriated all of the funds invested in Assensus Capital for his own use and benefit.  (*Id.*).

---

[2]   The PSR tracks the criminal complaint and provides detailed information about the Facebook/Ventures Trust II scheme and the Face-Off Acquisitions scheme.  Berkman subsequently pleaded guilty to a criminal Information that charged him with securities and wire fraud in connection with (1) a series of Ventures Trust offering fraud schemes involving Facebook, LinkedIn, Groupon, Zynga; (2) the Face-Off Acquisitions scheme; and (3) a separate scheme involving Assensus Capital.  Although all of these schemes could have been charged in separate substantive securities fraud and wire fraud counts, the parties agreed to group the schemes together in the charged securities fraud and wire fraud counts.  At his plea, the defendant expressly waived any duplicity challenges the Information.  (6/25/2013 Tr. 21-22).

## 2.  The Misappropriation of Investor Funds

The defendant's misappropriation of millions of dollars in investor funds was established by bank records.  The records show that Berkman transferred approximately $5.1 million of investor funds from the LLC accounts to his personal bank account.  Berkman used most of that $5.1 million, plus a $925,000 direct transfer from a Ventures LLC account, to pay creditors in his own personal bankruptcy proceeding and a related bankruptcy proceeding.  (Information, ¶ 6; PSR ¶¶ 27(g), 28).  In 2008, investors in a prior investment fund called Synectic Asset Management ("Synectic") obtained a judgment against Berkman, after a jury trial in Oregon state court, in connection with his misappropriation of investor funds.  Those creditors subsequently forced Berkman and the investment vehicle into an involuntary bankruptcy proceeding.  *See In re Craig L. Berkman*, No. 09 bk 05169 CED (Bank. M.D. Fla.), and *In re Synectic Asset Management, Inc.*, No. 09 bk 05172 CED (Bank. M.D. Fla.).  (Information, ¶ 1; PSR ¶¶ 10, 28).  In early 2011, Berkman agreed to pay $4,750,000 to settle various claims with the bankruptcy trustee for the benefit of, principally, the victims of his prior fraud.  Berkman ultimately used almost $6 million in investor funds to pay this settlement amount, plus related fees, interest, and costs.  (Information, ¶ 1; PSR ¶¶ 28; 6/25/2013 Tr. 19-20).

Berkman used the remaining money that he had transferred to his personal account (approximately $600,000) and another approximately $1 million taken directly from the Ventures LLC accounts to make large cash withdrawals, pay his personal legal fees, fund his own travel and other personal expenses, and make numerous other payments unrelated to the

purported business of the Ventures LLCs, Face-Off Acquisitions or Assensus Capital. (Information, ¶ 6; *see* PSR ¶ 27).

Furthermore, Berkman used approximately $4.8 million of investor money to make payments to earlier investors in the pre-IPO scheme or, in some cases, to investors who had made earlier investments with Berkman.  For example, in 2010 and 2011, Berkman transferred $400,000 from a Ventures LLC account to two individuals to whom Berkman owed money from investments they had made in unrelated ventures in approximately 2004.  (Information, ¶ 7; 6/25/2013 Tr. 19-20).

### 3.  Fraud In The Bankruptcy Court

According to the publicly filed settlement agreement in Berkman's bankruptcy case, the settlement included the following conditions:  (1) the settlement funds must come from Berkman's own funds, and "not from an investment fund which is managed for the benefit of third parties"; (2) Berkman was required to provide notice to the "funding source" for the settlement and his lawyers were required to certify to the court that such notice was given; and (3) Berkman agreed to "seek and obtain a finding from the Bankruptcy Court that Mr. Berkman's fund raising transaction that is the source of the Settlement Funds is a good faith transaction duly arising post-petition."  Berkman obtained the Bankruptcy Court finding based upon a sealed document that provided the required representations.  Berkman acknowledged in his guilty plea that his representations to the bankruptcy court concerning the source of funds used to satisfy the settlement and notice to the "funding source" were false and misleading.  (6/25/2013 Tr. 20; *see* PSR ¶¶ 28).

C.     **Berkman's Guilty Plea**

On June 25, 2013, Berkman appeared before United States Magistrate Judge Kevin Nathaniel Fox and pled guilty to Counts One (securities fraud) and Two (wire fraud), pursuant to a plea agreement with the Government.  (PSR ¶ 5).  Among other things, the parties stipulated in the plea agreement that the applicable loss amount was greater than $7 million but less than $20 million; that the offense involved more than 50 victims; and that the offense involved a misrepresentation of other fraudulent action during the course of a bankruptcy proceeding; and that Berkman has no criminal history points and is in criminal history category I.  Accordingly, the parties stipulated that the applicable Guidelines range for the defendant is 97 to 121 months' imprisonment.  (PSR ¶ 5).  Notwithstanding this stipulation as to the applicable Guidelines range, both parties reserved the right to seek a sentence outside of that range based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a).  (*Id*.).

In addition, Berkman admitted the forfeiture allegations in the Information and agreed to forfeit to the United States, a sum of money equal to $13,239,006 in U.S. currency, representing the proceeds traceable to the commission of the crime.  Berkman also has agreed to make restitution in the amount of $8,435,888.52.

This Court accepted the guilty plea by order dated October 3, 2013.

6

## DISCUSSION

**A.    Applicable Law**

The Guidelines still provide strong guidance to the Court following *United States* v.

*Booker*, 543 U.S. 220 (2005) and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005), although

they are no longer mandatory.  "[A] district court should begin all sentencing proceedings by

correctly calculating the applicable Guidelines range" – that range "should be the starting point

and the initial benchmark."  *Gall* v. *United States*, 128 S. Ct. 586, 596 (2007); *see United States*

v. *Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005).  The reason for this is that the advisory

Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely,

"ensuring similar sentences for those who have committed similar crimes in similar ways."

*Booker*, 543 U.S. at 252.  The Guidelines' relevance throughout the sentencing process stems in

part from the fact that, while they are advisory, "the sentencing statutes envision both the

sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita*

v. *United States*, 127 S. Ct. 2456, 2463 (2007), and the Guidelines are "the product of careful

study based on extensive empirical evidence derived from the review of thousands of individual

sentencing decisions," *Gall*, 128 S. Ct. at 594; *see also Rita*, 127 S. Ct. at 2464.

After making the initial Guidelines calculation, a sentencing judge must then consider

seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and

circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. §

3553(a)(1); the four legitimate purposes of sentencing, see id. § 3553(a)(2); "the kinds of

sentences available," id § 3553(a)(3); the Guidelines range itself, see id. § 3553(a)(4); any

7

relevant policy statement by the Sentencing Commission, see id. § 3553(a)(5); "the need to avoid

unwarranted sentence disparities among defendants," id. § 3553(a)(6); and "the need to provide

restitution to any victims," id. at § 3553(a)(7).  See Gall, 128 S. Ct. at 596 & n.6.

     In determining the appropriate sentence, the statute directs the sentencing judge to

"impose a sentence sufficient, but not greater than necessary, to comply with the purposes of

sentencing, which are:

> (A)    to reflect the seriousness of the offense, to promote respect  for the
> law, and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or
> vocational training, medical care, or other correctional
> treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## B.    Analysis

    As discussed more fully below, given the nature and circumstances of Berkman's

criminal conduct, and in light of the need to impose a sentence upon the defendant that reflects

the seriousness of that offense, promotes respect for the law, and provides just punishment; that

has a sufficiently strong deterrent effect; and that avoids unwarranted sentencing disparities, the

Government respectfully submits that a sentence within the advisory Guidelines range of 97 to

121 months' imprisonment would be entirely appropriate in this case.  The Probation Office

concurs in this assessment and recommends that the Court sentence Berkman principally to 97

months' imprisonment.  (Sentencing Recommendation at 31).

### 1. Application of the Sentencing Guidelines

There is no dispute as the applicable Guidelines range in this case.  Pursuant to Section 3D1.2(d) of the Guidelines, Counts One and Two are grouped together.  (PSR ¶ 34).  Because the offenses of conviction are fraud-related, Section 2B1.1 of the Guidelines determines the applicable offense level.  Pursuant to Section 2B1.1(a)(1), the base offense level is seven.  (PSR ¶ 35).  Because the loss from the offense exceeded $7,000,000 but did not exceed $20,000,000, the base offense level is increased by 20 levels, pursuant to Section 2B1.1(b)(1)(K).  (PSR ¶ 36).  Pursuant to Section 2B1.1(b)(2)(B), because the offense involved more than 50 but less than 250 victims, four additional levels are added.  (PSR ¶ 37).  Finally, two additional levels are added, pursuant to Section 2B1.1(b)(9)(B), because the offense involved a misrepresentation of other fraudulent action during a bankruptcy proceeding.  (PSR ¶ 38).  Because the defendant accepted responsibility for his criminal conduct in a timely manner, as reflected by his guilty plea, a three-level reduction is warranted, pursuant to Section 3E1.1.  (PSR ¶ 43).  Berkman's total offense level is thus 30.  (PSR ¶ 46).  Berkman has no prior criminal convictions and is in Criminal History Category I.  (PSR ¶¶ 48-49).  Accordingly, the advisory Guidelines range for the defendant is 97 to 121 months' imprisonment.  (PSR ¶ 78).

2. **An Analysis of the Section 3553(a) Factors Militates Forcefully In Favor of a Guidelines Sentence**

    (a).    **A Guidelines Sentence Is Appropriate in Light of the Nature and Circumstances of Berkman's Conduct, and Is Necessary to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment**

Craig Berkman orchestrated a shocking series of fraud schemes that had a devastating impact upon his investors.  Over a multi-year period, Berkman deceived ordinary people into placing their trust in him.  Rather than honoring his promises about the proposed investments, Berkman systematically abused that trust and misappropriated the investor funds for his own benefit.  The victim impact statements that we have submitted to the Court powerfully demonstrate the harm that this defendant has caused.[3]  The victims repeatedly mention that they placed their trust in Berkman (and his colleague Paul Tabet), and several indicate that their faith in people has been shattered.  Many of the victims are now experiencing serious financial hardships as a result of the loss of their investment.  Several investors have had their dreams of retirement destroyed; others are now concerned about how they will fund their children's education.  The fact that people lost money on this investment has for some exacerbated serious medical conditions and for others has caused strains in relationships with family and friends.  Some investors who introduced Berkman and his investment funds to family and friends now are chagrined to learn that they are an indirect cause of harm to others.

---

[3]    The Government has to date provided the Court with 21 victim impact statements, with cover letters dated September 26, 2013; October 21, 2013; December 5, 2013; and December 10, 2013. We expect that at least one investor will address the Court at sentencing.

The descriptions of the dealings that investors had directly with Berkman are especially illuminating.  Several investors described how Berkman evaded their questions about the status of the investment and gave creative explanations for his failure to deliver promised distributions. For example, one investor writes:

> I've never met Craig personally but I have talked to him on the phone innumerable times as his promised distributions were continually delayed.  Each time he had another inventive excuse for why money was delayed and how we were a week, or a day or, sometimes, even hours away from having resolution on the latest invented roadblock.  Some of the stories were elaborate.  Tales of delays in certificate legends being removed, SEC approval requirements, corporate validation of share certificates, international wire transfers being held up by US government for months due to the Patriot Act, rogue traders bundling wire transfers, suing his investment partners, auditors and investigators being hired to trace the missing funds, flying to NY for face to face meetings with traders, Craig "working like mad" to try to get things resolved, it went on and on for over a year after I attempted to liquidate my first investment.  All of it was pure fabrication.

(Victim Impact Statement of DM, submitted on September 26, 2013).[4]

The victim statements provide a poignant depiction of the seriousness of this crime and the harm that Berkman has wrought upon others.  These statements amply illustrate why a Guidelines sentence is warranted in this case.

The connection between the bankruptcy settlement with the Synectic investors and the present schemes are also important factors supporting a Guidelines sentence.  As noted above, in 2008, Berkman was found liable after a jury trial for his misuse of investor funds – which is exactly he did in this case.  Ultimately, Berkman agreed to a settlement with the prior investors, which he funded with the proceeds of the present frauds.  The similarities between the Synectic

---

[4]   To preserve the victim's privacy, they are identified herein using their initials.

case and the present case – especially the use of current investor proceeds to settle the claims – demonstrates that the present scheme was not an aberration, but rather was part of a pattern of fraudulent conduct that ended only when Berkman was arrested.[5]

Moreover, the representatives of the Synectic investors demanded assurances that Berkman was not using money from other investors to settle the claim, and Berkman made false representations to that effect to the Bankruptcy Court in order to effectuate the settlement.  This circumstance substantially exacerbates the seriousness of the offense.  Given this fraud upon the Bankruptcy Court, a Guidelines sentence is warranted to promote respect for the law.

This was not a momentary lapse of judgment.  Berkman lied repeatedly to investors – and in multiple ways – over a period of several years.  As noted above, the crime involved different offerings targeting different investors.  Berkman expended substantial time and energy in soliciting investors, creating documents to give the appearance of a legitimate securities offering, and communicating with the investors to fend off their requests for redemptions.  Viewed in the context of the overall level of activity the crime required, Berkman's request for leniency – as is often true in white collar criminal cases – "understate[s] the gravity of the underlying offenses by compressing the defendant's entire record of misconduct as if it were a single, isolated episode of crime, a one-time or sometime thing that occurred over a lifetime of otherwise immaculate behavior.  There is a fallacy in this argument.  It distorts the record. . . ." *United States* v.

_____

[5]   There is no indication that, had he not been arrested, Berkman would have stopped his fraudulent conduct.  Indeed, one investor relates that Berkman attempted to convince him to set up a real estate investment fund whereby Berkman would obtain funds from investors and the investor would identify and purchase properties for the fund.  (Victim Impact Statement of BM, submitted on September 26, 2013).

*Regensberg*, 635 F. Supp. 2d 306, 310 (S.D.N.Y. 2009).  Such an appeal to this Court's mercy is thus wholly inappropriate given the true extent and duration of the defendant's orchestration of this fraud.

In the end, there can be no getting around the fact that Berkman's conduct has had significant and far-reaching consequences.  The investment fraud that Berkman perpetrated has affected the lives of numerous investors who suffered combined losses of millions of dollars.  Berkman engaged in this scheme to benefit himself financially at the devastating expense of those who trusted him.  Furthermore, frauds like the one Berkman committed have an impact on overall investor confidence.  Indeed, cases like Berkman's have become more frequent in recent years and their adverse effects are felt in aggregate as investors analyze whether they will invest in the market.  Thus, Berkman's criminal conduct has even greater ramifications than those for the investors he personally defrauded.

Accordingly, Berkman's conduct weighs heavily in favor of a sentence within the advisory Guidelines range.  Such a sentence would reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

**(b). A Guidelines Sentence Is Necessary to Afford Adequate Deterrence**

The need for the sentence imposed to "afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), also strongly counsels in favor of a Guidelines sentence.  In light of the fraud perpetrated by the defendant, general deterrence is of great importance here.  Indeed, the legislative history of 18 U.S.C. § 3553 demonstrates that "Congress viewed deterrence as 'particularly important in the area of white collar crime.'"  *United States* v. *Martin*, 455 F.3d

13

1227, 1240 (11th Cir. 2006) (*citing* S. Rep. No. 98 225, at 76 (1983), *reprinted in* 1984

U.S.C.C.A.N. 3182, 3259); *see also United States* v. *Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006)

(deterrence of white collar crime is "of central concern to Congress").  As the *Martin* Court

noted: "Congress was especially concerned that prior to the Sentencing Guidelines, '[m]ajor

white collar criminals often [were] sentenced to small fines and little or no imprisonment.

Unfortunately, this creates the impression that certain offenses are punishable only by a small

fine that can be written off as a cost of doing business.'"  *Martin*, 455 F.3d at 1240 (citation

omitted).

      Indeed, general deterrence is seen as an important sentencing factor in fraud and white

collar cases because it is seen as being highly effective.  *See Martin*, 455 F.3d at 1240 ("Because

economic and fraud based crimes are more rational, cool, and calculated than sudden crimes of

passion or opportunity, these crimes are prime candidates for general deterrence.") (internal

quotation marks and citation omitted).  Unlike defendants in a gun or drug case, who often act

without reflection, there is reason to believe that individuals who engage in financial fraud can

be deterred by a substantial threat of penalties.  Their actions are calculated.  They choose to

engage in such white collar crime because they believe that the potential for significant financial

benefits outweighs the risk that they will be punished.  General deterrence is achieved by sending

a message that such outrageous acts of fraud will result in real penalties.  This Court's sentence

must send the important message that "when you get caught for engaging in fraud, you will go to

prison."  Moreover, the deliberate nature of fraud often renders it more difficult to uncover

because individuals engaged in fraud often take affirmative steps to conceal their conduct.

14

Indeed, Berkman did exactly that by his effort to pay off the Synectic investors and conceal the fact that he was using money from new investors to fund the settlement.

### (c).   A Guidelines Sentence Is Necessary to Avoid Unwarranted Sentence Disparities

In fashioning an appropriate sentence, the Court should also consider the "need to avoid unwarranted sentencing disparities."  Given Berkman's role as the mastermind of the scheme, the nature of his misrepresentations, the duration of his involvement in the fraud, and his personal use of the proceeds of the scheme, a sentence within the advisory Guidelines range would not result in any "unwarranted" disparity.  On this point, the Second Circuit has been clear that 18 U.S.C. § 3553(a)(6) "requires a district court to consider nationwide sentence disparities," *United States* v. *Frias*, 521 F.3d 229, 236 (2d Cir. 2008), and the Guidelines similarly seek to achieve that aim.

Berkman argues that the Guidelines range is "not supported by empirical evidence" and would negate the possibility of Berkman paying restitution or forfeiture."  (*See* Def. Ltr. at 13-14).  Contrary to this argument, enactment of the loss-enhancement provision was, in fact, the result of the consideration of empirical data:

> Empirical analyses of pre-guidelines practice showed that the most important factors that determined sentence length were the amount of loss and whether the offense was an isolated crime of opportunity or was sophisticated or repeated. Accordingly, although they are imperfect, these are the primary factors upon which the guideline has been based.

U.S. Sentencing Guidelines Manual § 2F1.1, cmt. background (2001); *see also id.* at § 2B1.1, cmt. background ("The Commission has determined that, ordinarily, the sentences of defendants convicted of federal offenses should reflect the nature and magnitude of the loss caused or

15

intended by their crimes. Accordingly, along with other relevant factors under the guidelines, loss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level under this guideline."). Indeed, although some criticize the Guidelines focus on the amount of the loss, no one can seriously dispute the common sense notion that the theft of a greater amount of money justifies a harsher punishment than the theft of a lesser amount. This, of course, is a key concept of proportionality.

Berkman notes that the loss-enhancement provision of the Guidelines has been criticized by some district judges in this circuit. In particular, the defendant cites to commentary by Judge Rakoff in *United States* v. *Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012), and *United States* v. *Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006), criticizing the application of Section 2B1.1. (Def. Ltr. at 12-13). These cases involve a Guidelines loss amount calculation that is very different than this case. In *Gupta,* Judge Rakoff was critical of the fact that the Guidelines range for the defendant – the tippee in an insider trading case – was predominantly based upon the size of his co-conspirator's illegal profits where the defendant had no control over the trades and received none of the profit. 904 F. Supp. 2d at 351-52. *Adelson* involved a President of a company who joined an accounting fraud conspiracy towards its end, but because the intended loss caused by the fraud was measured by the company's drop in market capitalization after the fraud was disclosed, he was subject to a Guidelines range of life imprisonment. *Adelson*, 441 F. Supp. 2d at 515. In each of these cases, on their specific facts, Judge Rakoff concluded that the Guidelines were off-base because they relied upon arithmetic calculations and did not take into account the complex of factors that a court must consider when sentencing a criminal defendant.

16

Upon consideration of all of the relevant sentencing factors applicable to the individual defendant, Judge Rakoff imposed non-Guidelines sentences.

In this case, by contrast, the loss amount is derived from the amount that the defendant himself caused investors to remit to his investment funds and ultimately misappropriated.  This is not a case where, as in *Gupta* and *Adelson*, the Guidelines range is based upon numbers drawn from the profits of others or market factors beyond the defendant's control.  Rather, the defendant – in deciding how much to steal – fixed his own Guidelines range.  The *direct relationship* between the defendant's actions and the loss amount distinguishes the Guidelines calculations in *Gupta* and *Adelson* from the present case.

Furthermore, Judge Rakoff is exactly correct when he states that the sentencing court must consider the whole measure of the defendant.  However, as demonstrated in this memorandum, this approach does not help Berkman, who stands convicted of directly victimizing numerous victims over a period of years and lying to a court to cover up his crime.

Finally, Berkman argues also that the Guidelines range is unfair because it would deprive him of the opportunity to generate the funds needed to pay restitution to the victims of his crime. (Def. Ltr. at 13).  Berkman's appeal to his obligation to pay restitution does not, however, override the important punishment and deterrent aspects of sentencing, which in this case, call out for a substantial sentence of incarceration.  Indeed, by Berkman's logic, any financial professional who commits investment fraud and loses a substantial amount of investor money should be able to avoid prison because their earning power is higher outside prison than inside.

17

Moreover, the fact that Berkman used the proceeds of the present fraud in part to pay off his previously defrauded investors militates strongly against giving him a chance to do it again.

### 3. The Individual History and Characteristics of the Defendant Do Not Counsel Against a Guidelines Sentence

Defense counsel argues for a non-Guidelines sentence in light of, among other things, the defendant's prior community involvement, contributions made businesses that he helped create in the past, and his relationship with his step-children.  (Def. Ltr. at 17-19).  Defense counsel also appropriately and accurately describes Berkman's acceptance of responsibility for his offense and efforts to provide assistance to the SEC in connection with the administrative proceeding against Berkman and his former attorney.[6]  (Def. Ltr. at 14-15).  Defense counsel also notes that the defendant has become estranged from his family during his incarceration and has experienced difficulties from his incarceration.  (Def. Ltr. at 15-17).  While the Court should, of course, consider these factors, the Government respectfully submits that a Guidelines sentence is nevertheless appropriate for this defendant.

Unlike many criminals who come before the Court with almost nothing, Berkman has enjoyed important advantages.  He has had significant employment opportunities that others have not, he rose to become a widely-respected figure in state and national politics, and he

---

[6]   The Government does not have sufficient information to agree or disagree with the contention that the defendant intended to surrender to the criminal authorities in Portland, Oregon.  It bears noting that Berkman learned in 2012 that the SEC's New York office was investigating his funds and had communicated with numerous investors.  In fact, Berkman initially sought to thwart the SEC investigation by filing a motion under the Right to Financial Privacy Act ("RFPA") to quash the SEC's subpoena for his bank records, which was denied in September 2012.  (*Berkman* v. *SEC*, Case No. 12-MC-66-T-17-TGW (M.D. Fla.)).  Thus, Berkman must have known by late 2012 that his scheme was on the verge of being exposed.

18

enjoyed the support of a loving family throughout his adult life.  Notwithstanding his

professional success and clear abilities, however, Berkman made the decision to engage in fraud

and deceit to benefit himself financially.  What is more, in touting his investment funds,

Berkman used his reputation and contacts with well-known public figures to convince people to

invest with him.

In considering whether a Guidelines sentence in this case is appropriate in light of the

defendant's individual characteristics generally and, in particular, his involvement with

charitable works and his community involvement, the Government respectfully submits that the

Court should consider:

> the general principle that the [S]entencing [G]uidelines sought to address the
> inequities of prior sentencing practices that tended to punish white collar
> economic crimes less severely than other comparable blue collar offenses.
> Relevant to this point is that white collar offenders, because of their greater
> wealth and leadership in the community, enjoy much greater opportunities to
> participate and rise to prominence in charitable activities, and also possess the
> means to contribute resources with larger generosity to community service
> organizations.  These social and economic advantages could enable them to gain a
> substantial edge over blue collar offenders who cannot make claim to comparable
> means and opportunities with which to mitigate the full impact of a heavy
> sentence.

*Regensberg*, 635 F. Supp. 2d at 310.

Finally, while the hardships Berkman and his family have suffered and are likely to

continue to suffer should he be incarcerated understandably evoke sympathy, it is a hard truth

that those who often suffer the most from a defendant's crimes are his own family members, who

have to live with the crime's consequences in much the same way as do the victims.  It is sad that

Berkman's ex-wife and children have turned their backs on him.  Unfortunately, Berkman's

19

predicament in this regard is not materially different from that of other incarcerated defendants and their families, all of whom suffer as a result of a defendant's criminal activity and subsequent incarceration.

As discussed above, Berkman's criminal conduct was not an isolated, aberrant act. This was a crime that was committed through a series of deceptive acts over an extended period of time. Berkman repeatedly lied to investors both orally and through fraudulent documents. Most egregiously, he stole from the victims of the charged fraud to pay off his prior victims, and lied to the Bankruptcy Court to carry out that scheme. Accordingly, and on this record, Berkman's individual history and characteristics do not overcome the various compelling reasons for imposing a Guidelines sentence here.

### C. The Defendant's Restitution and Forfeiture Obligations

#### 1. Restitution

The Mandatory Victims Restitution Act, 18 U.S.C. § 3663A ("MVRA"), applies to the offense at issue because Berkman's offenses against property were committed by fraud or deceit. *See* 18 U.S.C. § 3663A(c)(1)(A)(ii). The MVRA provides that, regardless of a defendant's economic circumstances, the Court, in its order of restitution, "shall order restitution to each victim in the full amount of each victim's losses as determined by the court." 18 U.S.C. § 3664(f)(1)(A). *See United States* v. *Coriaty*, 300 F. 3d 244, 253 (2d Cir. 2002) (observing "the statutory focus on the victim's losses and upon making victims whole").

Restitution may only be ordered "for losses that [were] . . . directly caused by the conduct composing the offense of conviction," *United States* v. *Silkowski*, 32 F.3d 682, 689 (2d Cir.

20

1994), and then, only for the victim's "actual loss," *United States* v. *Germosen*, 139 F.3d 120, 130 (2d Cir.1998); *see also United States* v. *Carboni*, 204 F.3d 39, 47 (2d Cir. 2000).

The Government bears the burden of demonstrating the loss amount sustained by the victim as a result of the offense. 18 U.S.C. § 3664(e). Any dispute as to the proper amount or type of restitution is to be resolved by the court by a preponderance of the evidence. *Id.* "Findings of the amount of loss may be based upon reasonable estimates." *United States* v. *Agate*, 613 F. Supp. 2d 315, 323 (E.D.N.Y. 2009) (citing *United States* v. *Uddin*, 551 F.3d 176, 180 (2d Cir. 2009)); *United States* v. *Fogel*, 494 F. Supp. 2d 136, 138-39 (D. Conn. 2007) (accepting restitution methodology that "reasonably approximate[d]" actual loss). At the same time, however, a restitution award must be based on "more than mere speculation about a victim's actual loss." *United States* v. *Donaghy*, 570 F. Supp. 2d 411, 423 (E.D.N.Y. 2008).

In his plea agreement, Berkman has agreed to restitution in the amount of $8,434,883.52, which is the amount set forth in the PSR. (PSR at 33). However, in calculating the defendant's restitution obligations, the Government has come to the view that there are approximately 87 victims of Berkman's Ventures, Face-Off and Assensus frauds who have net losses outstanding, and that those victims are collectively entitled to a total of approximately $11,097,813 in restitution.[7] The Government intends to submit a proposed Order of Restitution with a Schedule of Victims within the 90 day period following the sentence permitted by law.

_____

[7]   In the original calculation used in the plea agreement, the Government subtracted the $4,803,117 that was returned to investors from the $13,239,006 that was raised in the charged schemes. However, much of the $4.8 million was returned to persons who had not invested in the Ventures, Face-Off, and Assensus schemes, but rather had invested with Berkman prior to

### 2. Forfeiture

Finally, the Government notes that at Berkman's June 25, 2013 guilty plea, Berkman admitted the forfeiture allegations in the Information and agreed to forfeit the sum of $13,239,006.  Accordingly, the Government respectfully requests that the Court orally pronounce at the time of sentencing that Berkman shall forfeit $13,239,006 and enter a Final Order of Forfeiture to that effect.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should impose a sentence within the advisory Guidelines range of 97 to 121 months' imprisonment, order the defendant to pay restitution to victims in the amount of approximately $11,097,813 million, and order the defendant to forfeit to the United States approximately $13.2 million.

Dated:  New York, New York
        December 12, 2013

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney for the
                              Southern District of New York

By:                          
                              John J. O'Donnell
                              Matthew L. Schwartz
                              Assistant United States Attorneys
                              Tel.: (212) 637-2490/1945

---

the charged schemes.  The transfers to such persons should not implicate the restitution owed to the victims of the charged schemes.

## CERTIFICATE OF SERVICE

I, John J. O'Donnell, affirm under penalty of perjury as follows:

1.   I am an Assistant United States Attorney in the Southern District of New York.

2.   On December 12, 2013, I caused a copy of the foregoing to be filed and served on ECF and delivered by hand to the following:

Peggy Cross-Goldenberg, Esq.
Federal Defenders of New York, Inc.
52 Duane Street – 10th Floor
New York, NY 10007

Senior USPO Wanda Whitney
United States Probation Office
Southern District of New York
500 Pearl Street
New York, NY 10007

Dated: New York, New York
         December 12, 2013


John J. O'Donnell
Assistant United States Attorney
(212) 637-2490

23